Good morning, your honors, and may it please the court. Michael Mutey from Benesh here for the Wilton Rancheria tribe. I'd like to reserve five minutes for rebuttal, please. Your honors, this is a case about tribal sovereignty. Wilton Rancheria, a sovereign nation, enacted the Tribal Labor Relations Ordinance through its full constitutional legislative process in 2019. The Tribal Labor Relations Ordinance, but he concluded that doing so was not a sovereign act, so he disregarded the TLRO and concluded that a prior private agreement overrides that tribal law. That decision manifestly disregarded the law. The trial court erred by denying Wilton's petition to vacate, and it did so in at least three ways. First, the did so by holding that a compact with California somehow extinguished the tribe's power to legislate. Compact making, however, is a... I thought the district court was a little... the district court said that the arbitrator, it was a little bit more nuanced than that. It said that, acknowledged that there was tribal sovereignty at issue here, but that they had, when they used that sovereignty to enter into an agreement which effectively ceded their tribal sovereignty under the agreement. Why is that manifestly unjust? The MOA did not... it was not an act of tribal sovereignty on par with the TLRO. The TLRO went through the full legislative process, all three states. Can we start with what Judge Nelson just said? Do you dispute that a tribe could do that? I know you obviously don't think that's what happened here, but do you dispute that a tribe exercising their sovereignty could enter into an agreement with somebody and give up their sovereignty in some sliver? A, you agree they could do that? I do agree that they could, although... Okay, so if they can, and I guess you would agree that if you're somebody who's going to make an agreement with a sovereign entity, that might be something you really want them to do. You don't want to make a deal with them that they can just back out of, so you have to, which is what sovereigns can kind of do, so you'd want that. This all goes to your manifestly disregarded. In the arbitration context, you have to, what the words are, you have to manifestly disregard the law, not get the law wrong. Reading the arbitration decision and reading the district courts, it's just unseen. It's really hard for me to see that the arbitrator disregarded, as in didn't take into account sovereignty at all, just ignored it, which would be another way, I guess, a synonym for manifestly disregarding. Is your position that the arbitrator ignored it, or is it your position that somehow the arbitrator got it so wrong that it's effectively ignoring it and therefore meets the manifestly disregarded? The latter, Your Honor, and I think this Court's precedent illustrates exactly why this arbitrator's... What's the cases to say that if you don't actually disregard, you actually don't ignore, as an arbitrator, but you get it really wrong, that it meets that standard? I'll offer two, Your Honor. First, Comedy Club, Inc. versus Improv West Associates. There, the Ninth Circuit held that an arbitrator manifestly disregarded the law. When he acknowledged a statute, there was a provision of the California Labor Code, but he refuses to apply it. Same here. The arbitrator acknowledged the TLRO, but he refused to apply it. Okay, but I mean, all these things... Look, I have a problem with this. I mean, I wrote the Hay Day opinion, which isn't directly on me, but does, you know, applies this manifestly unjust. I mean, it was completely wrong application. Absolutely wrong. Cost them millions of dollars. I thought, there's no way we can uphold this. But when you look at it, I mean, it goes to what Judge Van Dyke is saying, that the standard is so high, and so when you come in and say, well, yeah, but he just disregarded... He didn't disregard it. He said, there's two agreements. There's TLRO, and there's the MOA, and I think the MOA applies here. He could be completely wrong. He could be completely wrong. The problem is, when you agree to arbitrate under the FAA, that's what you get, is an arb... You know, you're bound by the arbitrator. It's very, very difficult to say, to unwind these arbitral decisions. I fully acknowledge the high standard here. You just think you meet it. I do think we meet it. Do you meet it because tribal interests are at issue here? Does that somehow put this outside of it? Because, to me, he recognized tribal interests were at play here. He said it just doesn't control. Does that somehow give you a different standard because the tribal interests, in your view, were, you know, disregarded or trampled on? Is that different than any other contractual right? Tribal sovereignty is not a contractual right. It is a core principle that the arbitrator manifestly disregarded by concluding that the tribe had sacrificed it by exercising its sovereignty and entering into the... Here's where I'm from. But if you agree, at the very beginning I asked you, would you agree that you could... that a tribe can come in and cede some of its sovereignty? And I think you agreed that, and I think you have to, that they can do that. Then I assume you would agree that that issue of whether the tribe did, in fact, actually cede some of its sovereignty in a given instance is not somehow... I want to say that that issue can be arbitrated if a tribe agreed to arbitrate that. That issue, right? Could it be arbitrated? Or is your position that that just can't be arbitrated? I don't think that's your position. Perhaps I need to clarify. I think if a tribe goes through the full constitutional process of legislating to cede its sovereignty, then it could do it. Signing a contract doesn't do that. Let's just make it simpler. If you agree that a tribe can cede its sovereignty, and you agree that that issue can be arbitrated, okay, then beating the drum about how important doing what an arbitrator can do, deciding whether or not sovereignty was ceded, manifestly disregarded. Because it seems to me your arguments are basically, sovereignty is so important here that by not recognizing and applying the sovereignty, then the arbitrator manifestly disregarded. But the arbitrator did take it into consideration and just concluded that the tribe had ceded it, and maybe got that wrong. Maybe got that wrong, but I don't see how that meets the manifestly disregarded. Unless, to Judge Nelson's question, sovereignty somehow is just different in kind, and so an arbitrator can do it, but they have to say magic. I don't know. I'm trying to figure out why the importance of sovereignty, which is super-emphasized by you, and understandably so, why that somehow changes the inquiries, whether they manifestly disregard it. Because the arbitrator didn't, in any sort of plain meaning of disregard, didn't disregard it, completely took it into account, just reached a conclusion that it had been ceded. Waivers or abrogations of sovereignty are not lightly inferred. And here, the arbitrator did just that. He lightly inferred a waiver of sovereignty by the tribes exercising its sovereignty, by entering into the compact. That's a problem. I want to make sure I understand your argument about why you think the arbitrator was wrong here in a way that we can take cognizance of. Is it your position that just that when the arbitrator turned to the issue of how the correct understanding of the memorandum of understanding relates to the TLRO, that he got that wrong? Or are you also making an argument that the arbitrator had authority to determine the scope of the MOU, but didn't have the authority to interpret the status of the TLRO, and therefore its relationship to the MOU? Or do you concede that the issue of how the TLRO and the MOU intersect was properly within the purview of the arbitrator? The agreement to arbitrate was for the arbitrator to decide the relationship between the MOA and the TLRO. Even a post-enactment TLRO? A post-MOU change to the TLRO? Correct. You can see that was properly within the scope of the arbitrator's ken to look at how the 2019 amendment to the TLRO relates to the MOU. That's what the parties agreed to arbitrate. That was the agreement to arbitrate in this case. And here, a couple of things. Why would you agree to arbitrate it if your view was it can't be arbitrated because it is so intertwined with our tribal sovereignty? The agreement to arbitrate was necessary. There was a procedural thicket in the district court. Initially, the union sued. That was to pursue a different arbitration under the MOA. Your position that if the tribe passed some other law that isn't mentioned in here that might override in some way in the exercise of its sovereignty some provision in the MOU, then the arbitrator would have had jurisdiction to decide that issue as well? The MOA expressly recognized that subsequent legislative enactments might nullify portions of the MOA. That's in paragraph 16 of the MOA 489. Does that mean that it is within the can of the arbitrator to decide when that occurs? We don't dispute that that was within the arbitrator's. What the parties bargained for here. Maybe this is part of what Judge Van Dyke is getting at. It seems really odd to say that it's important to have the sovereign right to override, and yet we subordinated it to an arbitrator. I mean, because if the federal government enters a contract, Congress can override it tomorrow. There might be a breach claim in the court of federal claims, but there's no question Congress can override it with the exercise of its sovereign authority. But one would not think that the scope of Congress's sovereign authority would be itself part of the contract. Agreed. But you're conceding that the relationship between the MOU and the subsequent sovereign enactment was within the arbitrator's can to decide. The parties bargained for the arbitrator to resolve the question in front of him. And the question in front of him required him to consider the core principle of tribal sovereignty, to consider the legislative enactment valid tribal law that was the TLRO. And he didn't do those things. So if we take all of your argument, and I understand where you're at, but this is really important, because if we take all your arguments and put them together, it feels like your argument is, that you are conceding, yes, the arbitrator had the authority to decide all these things. But if you add that to your other arguments, your further argument is the arbitrator had the authority to decide, but if the arbitrator decided it against us, then you have to overturn that because that is somehow by definition, this is what I was trying, a manifest disregard of the law. So it's a little bit of a heads, we win, tails, you lose type situation. Yes, we completely submitted to this arbitration, including all the questions and answers. Because we knew you couldn't actually do it. Because once it comes to you guys, if we lose, we will win. And that feels kind of unfair. Perhaps it would be possible for an arbitrator to fully account for tribal sovereignty and the TLRO as a valid legislative enactment, but that is not what this arbitrator did. Looking at his decision, he gave three reasons. Two of them had to do with motivations regarding the MOA. That kind of presumed the primacy of the MOA over the TLRO. And then he cast aside the TLRO saying, look, this wasn't a valid act of sovereignty. Okay. So now we are kind of back to, ordinarily, if I was hearing these kind of arguments in attacking an arbitrator's decision, I would just say, yes, it sounds like the arbitrator really flubbed this one. But it also doesn't sound like, I mean, you're telling me all kinds of things the arbitrator did, but did wrong. And so it doesn't sound like the arbitrator manifests a disregard, which kind of brings us full circle. Is the sovereignty thing doing some special work here? And I don't, I'm struggling with that. And your argument. The sovereignty does this work. It makes the TLRO a law. The arbitrator did not apply it as a law. He looked at it as just something else that was out there. No, because the arbitrator said both, I mean, the arbitrator said both exist and they can both exist at the same. He didn't even say the TLRO doesn't also provide a different mechanism. He said you can use both mechanisms, the one in the MOA. So, I mean, I didn't quite understand. That doesn't seem to me at all a fair representation of what the arbitrator concluded. So I think the ASPEC engineering case is most relevant here. In ASPEC engineering, the court overturned an arbitrator's award, vacated an arbitrator's award, because there the contract incorporated federal acquisition regulations. And the arbitrator said, I really don't think it's reasonable for an Afghan subcontractor to comply with those. It's not reasonable for the parties to expect that they would comply. But there you at least have the argument that he said, I'm not going to consider those. That falls within potentially the manifest disregard. That's not what happened here. He didn't say, oh, well, you can't get around this with the TLRO. He didn't even say the TLRO does not apply. That's the thing. He didn't say I'm picking MOA over. He just said, I think both apply. I don't think they're inconsistent. He disregarded the TLRO as a sovereign act. Very clearly, he did that. All he did was he didn't say that the TLRO essentially abrogated and made ineffective as a section 8 or whatever. The one section, I can't remember which, section 2, 8, 7. I see my time is up. We'll give you time for rebuttal. Would you like me to answer that now, Your Honor, or save for rebuttal? The TLRO is incorporated into the MOA. The MOA says expressly that the parties will agree that the TLRO governs. That's the then existing version, right? Because the whole point here is it was later amended after that was signed. That was, as I understand it, an exercise of sovereign authority and overrides the contract. The timeline is in June of 2017, the compact was signed by the tribe, the compact with The next month, July of 2017, the parties began negotiating the MOA. The compact became effective in January 2018, and then the TLRO was executed, signed, passed into law in April 2019. So that's the timeline. After the contract? After the MOA. The MOA. So while the union was negotiating the MOA, it knew full well that, one, the compact had passed, two, the compact would require a TLRO, and three, that TLRO Just so I understand the timing, so the MOA was executed after the compact or before? The MOA was executed two months after the compact, in August of 2017. Just to be clear, I think there's two different versions of the compact. There's the compact and then there's the TLRA, which is basically the compact language plus a couple other provisions. Is that correct? The compact required passage of the TLRO. There was a model TLRO attached to the compact. And there were some added provisions in what actually was passed, which happened after the MOA. Correct. The prefatory provisions of the TLRO that passed made clear the tribe's intent that the TLRO be narrowly construed and to require no more than the compact required. That's important. That's incorporated into the contract. And further, the contract, the MOA, in paragraph 16, expressly acknowledges that the parties anticipated that subsequent legislative enactments could nullify portions of the MOA. This is what Judge Collins was getting at earlier. Since it was passed later and it's a sovereign act, that's basically like the United States saying, yeah, I know we agreed to pay you all this money, but Congress passed this thing and we don't have to. But in answer to Judge Collins' questions, you said, yeah, but we agreed to have that arbitrated, including the subsequent thing that was passed by the tribe. And so I think your only possible way I think you could win would be if somehow that subsequent thing was not really before the arbitrator. The arbitrator could not interpret the subsequent thing that was passed. And you conceded that it was before the arbitrator, Judge Collins. The parties acknowledged through the MOA that there would be subsequent or could be subsequent legislative developments that could nullify provisions of the MOA. The arbitrator disregarded the TLRO. He did not disregard it. What he said is that he read it a later thing and said it did not actually, it didn't, because he said it didn't actually abrogate the portion that you want to have abrogated. That's what he did. He interpreted it. Could have got that wrong. Maybe got it badly wrong, but that's what he did. And so unless there's some reason I honestly don't think it's that hard, Your Honor, for us because of the comedy club case. In the comedy club case, same thing. The arbitrator identified a statute and said, here, I know that statute exists. I acknowledge it, but I'm just not going to apply it. See, that's different. That's, as Judge Nelson said with regard to the other, that's different because here he didn't do that. What he did is he said this other, it's like having two statutes. It's not saying I'm not going to apply this other statute. It's going to say I'm going to apply both. You both win. You could do it under the MOA's provision, whatever check thing, or you can do it under the TRA. And that's different. Judge Nelson is trying to keep control of this thing. Not really. I've lost control, and I'm happy with that. But why don't we give you some time for rebuttal at this point. Thank you, Your Honor. Yeah, thank you. These are important issues. May it please the Court, Kristen Martin and McCracken, Stemmerman, and Holsberry for the Plaintiff upheld the unite here. Let me start by laying out the timeline. Here's what happened. As counsel said, in June and then in July, the tribe and the governor of California signed the compact. The TLRO is an exhibit to that compact, and the compact that was signed in that time said if this compact goes into effect, it needs to be ratified by the legislature. But if it goes into effect, the tribe has to enact the TLRO identically. It uses the word identical, but enact the TLRO verbatim as a condition of opening a casino and then continuing to operate the casino. So that happened in June and July. In August, the union and the tribe signed the Memorandum of Agreement. That Memorandum of Agreement referenced the TLRO in paragraph 2. So they were referring to the existing TLRO. Well, there's only one TLRO, and let me explain that. They were referring to what was attached to that compact, which is what the tribe had to enact identically without changing any words of it. Was there a TLRO on the books that differed from the compact version at that time? No. No, okay. So, in August, the tribe and the union signed this Memorandum of Agreement. They know what the TLRO says because it's attached to the compact that's already been signed, and it's a model TLRO that's attached to many compacts with many tribes. They agree that what the union will give in exchange, the union's consideration is, in addition to labor piece, is also to go and lobby for this compact before the California legislature. The union does that. I believe in October of 2017, the legislature ratifies the compact, and the compact goes into effect. The tribe enacts its TLRO as the compact required it to do, as it agreed to do in the compact, again, without changing any words of it, put in a prefatory section, which— So you say without changing any words. They didn't, to be precise, they didn't subtract anything from it because that would be problematic, but they added a few things, including a provision that says, we're going to interpret this as narrowly as we can get away with. Sure. Sure. They say, we're enacting this because the compact requires us to do. That's in the prefatory section. And then they say, it will be construed narrowly. Fine. We have no problem with that. But they're saying, we're doing this only because we agreed to— I rely heavily upon these additional words as influencing the analysis of how the MOA and the TLRO interact. That's how I read their briefing. They narrowly, interpret narrowly. They're saying, you should interpret any concession of sovereignty narrowly, and you should, so they are relying on that. You agree with that? I don't think it does anything for them. Let me read the language. How about this? I would agree with you that it seems like it does less for them if, as, am I correct that the arbitrator's conclusion here was basically, yeah, you get the provisions, the, what's it called? Something check. Card check. The card check provision of the MOA. But you also have, so we could do it either way, is basically what they're saying. So, he's not, I suppose it would be interesting, more challenging if the arbitrator had found a conflict. But it's actually the opposite. The arbitrator found there was no conflict and that they, that you could have both. Exactly. The arbitrator credited testimony from the attorney who negotiated the original TLRO for tribes that the TLRO was modeled after the National Labor Relations Act. And just like the National Labor Relations Act, it sets out an election process. It says nothing about card check. But it doesn't say a card check, a different route to recognition, the card check route, is prohibited. And that's what he found, that the tribe agreed to a card check. That's unquestioned in paragraph seven of the MOA. And nothing in the TLRO prohibits the union from proceeding on that path. So when the arbitrator found that the tribe must comply with the MOA, he's essentially saying the tribe must do what it promised the union it would do. And there's nothing in the TLRO, whether we treat that as a provision of the compact, which is what we say it is, or some sort of independent tribal law, there's nothing in the TLRO that says it can't comply with the MOA. Well, that would be where I think they'd go to the narrow, you know, I guess one way to interpret the TLRO narrowly would be to say that it's, that it's specific procedures for how you recognize a union are exclusive, right? So different than the NLRA. That would be, I think that would maybe be their argument. Let me say two things in response to that. One is the TLRO itself, which the tribe enacted, doesn't give the tribe authority to decide how to interpret it. It says an arbitrator, any issues under this TLRO will be resolved by arbitration. So the tribe isn't, didn't have the ability to use its own government processes to decide how to enforce this law. That's what's strange here. And I mean, you, you heard us, I mean, if it's a, if it's a sovereign issue that couldn't be decided by the arbitrator, it's hard to understand why it was sent to the, why it was sent to the arbitrator. I mean, if the United States were involved here, and the question was, you know, does Congress have the authority to do this? The United States would never agree to send that to an arbitrator, I assume. Yeah. I mean, the, the, what the testimony before the arbitrator was, was that the TLRO is a tribal law in name only. It was structured as a... And that testimony came from who? From an attorney named Howard Dickstein, who negotiated the original TLRO. I see, but not, he was not put up by the tribe. He was not a tribal witness. No, the union called him as a witness, but he negotiated the original TLRO. But did the tribe say anything to that effect? They didn't, did they concede this in the, before the arbitrator, that it was tribal sovereignty in name only? They contested that. No, no, they, they argued that this was a tribal law, and so it should trump the, they had two different arguments. They said it should trump, the MOA. They said, they said, well, look at... They never argued it's a tribal law, not only should it trump, but you should stay out of this because this affects our tribal sovereignty. Absolutely not. So, so how we ended up in this arbitration proceeding is the union invoked its rights under the MOA. And one of the first things that has to happen is the parties have to meet to select an arbitrator under the MOA, that arbitration procedure. The tribe said, no, we won't do that because we think the TLRO trumps this or the TLRO controls. So the union was preparing to sue to compel the tribe to do so. And, and the tribe said, well, we want to arbitrate under the TLRO. So the union's fine. If that's, if you want to arbitrate this question under the TLRO of, of whether the MOA or the TLRO provides the procedure to use to get to recognition, we'll do that. In fact, the tribe submitted a claim for arbitration with American Arbitration Association. And then, and this is on the record, there's an email trail. I had a conversation with the tribe's attorney and we agreed that we would do that. We selected the arbitrator. We met with the arbitrator and agreed on the issue that would, the arbitrator would decide. That's in the arbitrator's decision. I think there's no question that the tribe did not reserve any objection to the arbitrator's power to decide this question at all. And even now their argument doesn't seem to be that the arbitrator couldn't decide this question. It's kind of a, they're smuggling in, instead of saying we were sovereign, they didn't have jurisdiction. So they're basically saying we're sovereign. And so it somehow feeds into the manifestly disregard inquiry, as I understand their argument. And I'm, obviously you can tell I'm struggling with what is it, what work does that do? I don't understand what work that does. I don't either. And so we'll say, one of you referred to this as being somewhat odd. And it's odd because, it is odd. This witness testified was that the only reason the TLRO is not just a pure term of the compact, but it's something the tribe must enact, is because in 1999 when the compacts were originally negotiated, there was a lot of time pressure to get it done. There was a deadline because the legislature that had to ratify the compacts was, its session was ending. And all the terms of the TLRO, the labor provisions, hadn't yet been negotiated. They hadn't reached a final agreement on that. And so what the tribes and the state agreed to do, to be able to go and get this compact ratified in the 1999 session, but still resolve the labor provisions, is to say, there's a provision in that original 99 compact that says, this compact is only valid, and this is quoted in the arbitrator's decision, this is only valid if we get to an agreement on the labor provisions and the tribe enacts those labor provisions as a tribal law. And the witness explained that was sort of a workaround because we couldn't come back and have the legislature ratify that after its session's closed and they needed to get it done. You mentioned that the arbitrator concluded that this was a sovereign law and name only sort of thing. And I was trying to figure out what work that part of the arbitrator's decision does, because it doesn't seem to me that given the ultimate conclusion the arbitrator reaches, that that really matters much. I mean, whether this is a full sovereign law, as the tribe is emphasizing, the TLRO, the one that was enacted after the MOA, or whether whatever that other thing is, if the conclusion of the arbitrator is that no, both provisions are basically, the conclusion is that the TLRO should not be interpreted as having abrogated provisions of the MOA. That's essentially what the, as I read the arbitrator's decision. So what does it matter if that's the outcome, whether the TLRO is full strength, sovereign law, or something else? Well, I think that's in the arbitrator's decision because he was responding to an argument the tribe was making to him. The tribe was saying, I think, alternative arguments. One, you know, here's how you should interpret the MOA's reference. I have exactly the same question, which is whether or not that third holding in the arbitrator's decision on page 19 is load-bearing in any respect. Because as I understood it, the arbitrator was saying there is, in fact, no conflict between the TLRO and the MOA. And if that's the case, then it doesn't matter whether the TLRO is an exercise of overriding sovereign authority because there's no conflict. And in that case, this third finding, which seems to me extremely doubtful, is not load-bearing. I think that's correct, Your Honor. And he was simply responding to an argument the tribe made, but he could have said, I'm just not going to reach it because I don't need to. I don't know how he had authority to decide the status of the TLRO under the compact and to make these claims that, by entering into an agreement that's somehow not a sovereign act, none of that seems to me to make any sense. Well, I think what he's saying, I think when he's responding to an argument the tribe put before him, and he is, I think what he's saying, the way I understand it, he's saying the tribe, when it entered into a compact in which it said it would adopt this identical TLRO, it was giving up the right. It said it had the sovereignty. If the United States signs a treaty with another country, it gives its sovereignty to the other treaty? I mean, two sovereigns enter into a compact. And therefore, that's not a surrender of the sovereignty to the other. They're each exercising their sovereignty to reach an agreement. Absolutely, Your Honor. I think what he's saying is, as a condition of operating the TLRO. He said the opposite. They surrendered their sovereignty to the State of California. Here's how I understand it. He's saying, he's saying, as a condition of operating the casino, because none of this matters if there's not a casino. So he's saying, as a condition of operating the casino, the tribe agreed that it would adopt this TLRO as a tribal law, identically. So giving up the right to amend it, make decisions about it, about what other provisions it might like, how else it might like to regulate labor relations. It gave that up by entering into the compact and saying, we won't handle this on our own. Now, I do want to make one other point, though, and I don't think the court needs to reach this, but I think it's important to understand. There's a very real question about whether the tribe even has a sovereign authority to regulate labor relations. Our position is that... So, yeah, you had that in your brief. Okay, but back to the load-bearing question. It's all fun, but what difference does it make? Because they didn't, because he didn't conclude there's a conflict between the two. So, you got the tribe entering into an agreement with somebody, and over here you got the tribe passing a law. Let's assume for a second that it's full-blown sovereign act, whatever that carries with it. If there's no conflict between the two, then I don't understand what... It would be different if the arbitrator had said, blatant contract between the two. I can't deal with that. I'm going to knock out this provision in the... What is this? PLRO. I'm going to knock that out. That's not what he did, though. So, again, just to be clear, is your position that it makes a difference at all? The arbitrator could have ended his decision without responding to that argument by the tribe. All right. We ask that the district court order be affirmed. Thank you. Thank you. We'll give you two minutes for rebuttal. Thank you, Your Honor. I'd like to start by addressing the question about whether that portion of the award was load-bearing. It was. Under Garvey v. Roberts, we don't look at arbitration awards and think, is there another way we could get to the same conclusion, the way we might affirm on a different ground of a district court's opinion. But you said... I went through a long colloquy. You submitted the decision of whether or not there's a conflict between the TLRO and the MOA to the arbitrator, and the arbitrator seems to have concluded that there was, in fact, no conflict between them. And that doesn't seem... Even if it's a sovereign act, that doesn't seem to impinge in any way on your sovereignty to acknowledge that you agreed to submit it. So that seems to be the problem for me. Well, I think that shows why it was load-bearing, Your Honor. The opinion, the award does not say, I'm looking at both of them, and I don't see a conflict. It doesn't say that. It says, we think that the intent for entering into the MOA was this on the union side. We're not buying the argument about the intent of the MOA on the tribe side. And, oh, the TLRO isn't an obstacle because it wasn't a sovereign act. That's why it's load-bearing. I think the problem, and maybe you can address this, is just, you never seem to argue before the arbitrator that he couldn't decide these issues. To the contrary, you sort of said, no, you can. And so I'm trying to figure out how much weight that places into the argument you're now making. It's almost like a quasi-waiver type of argument. Under the TLRO, the tribe was required to submit to arbitration the dispute. I understand, but you still could have submitted to arbitration and said, here's the limits, here's the contours of that arbitration, and you never did that, as you appear to be trying to get us to do now. I'm wrestling with your question, Your Honor. Well, so am I. One of the hazards of being an appellate lawyer is frequently you take over a case after the work, before the arbitrator and before the trial court has happened. So I can't speak to what the thought process was or what the reasoning was there. What we have is an arbitration award that disregards, with apologies to Judge Van Dyck, that disregards the tribe's sovereignty and the TLRO as a sovereign act. By doing that, he cleared the way to elevate the MOU. But it says right here, he discusses the argument about there being no conflict between the TLRO's election procedure and the MOA's card check procedure, and seems to agree with that. I'm sorry, Your Honor. He says there's no conflict? Yeah, I mean, he's discussing the union's argument that there's no conflict and seems to endorse that. Am I misreading it? We heard the union say that, and with respect to the union and to the arbitrator, we don't see how you get there. I think the most relevant case there is ASPIC. Their refusal to apply an incorporated law means that the award doesn't draw its essence from that agreement. And here, we have paragraph two of the MOA, which says we recognize that the TLRO will govern. TLRO section 3210 twice uses mandatory language about a secret ballot election. It says if dated and signed authorization cards from 30% or more of the eligible employees will result in a secret ballot election. It says if the election officer determines that the required 30% showing of interest has been made, the election officer shall issue a notice of election. That's a conflict. That crowds out and precludes the card check procedure. And so under either the manifest disregard of the law standard or the failure to draw its essence from the agreement, either of those standards, both of those standards are satisfied. If I may conclude briefly. You got like five seconds. Okay. Under this court's precedents, including Comedy Club Inc. and ASPIC Engineering, the arbitrator's treatment of the TLRO compels reversing the district court and vacating the  Thank you. Thank you for your time. Thank you to both counsel. Your arguments have been very helpful. The case is now submitted.
judges: NELSON, COLLINS, VANDYKE